# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

LIONS HEAD HOMEOWNERS'  )
ASSOCIATION, A not for profit Tennessee)
Corporation, WHITE BRIDGE  )
NEIGHBORHOOD ASSOCIATION, INC., )
FRIENDS OF RICHLAND CREEK, INC.,  )
MIKE LAMB, and THE DOMINICAN  )
CAMPUS,  )
 )
     Plaintiffs/Appellants,  )
 )
VS.  )
 )
METROPOLITAN BOARD OF ZONING  )
APPEALS, METROPOLITAN  )
GOVERNMENT OF NASHVILLE,  )
DAVIDSON COUNTY, TENNESSEE,  )
and THE MARTIN COMPANIES, INC.,  )
 )
     Defendants/Appellees.  )

**FILED**

October 1, 1997

Cecil W. Crowson
Appellate Court Clerk

Davidson Chancery
No. 95-2071-I

Appeal No.
01A01-9611-CH-00505

APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

For the Plaintiffs/Appellants:

George E. Barrett
Phillip A. Purcell
Barrett, Johnston & Parsley
Nashville, Tennessee

For Metropolitan Board of Zoning
Appeals and Metropolitan Government
of Nashville and Davidson County:

Thomas G. Cross
Nashville, Tennessee

For The Martin Companies, Inc.:

Hugh C. Howser, Jr.
Trabue, Sturdivant & DeWitt
Nashville, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# O P I N I O N

This appeal stems from a decision of the Metropolitan Board of Zoning Appeals to grant a conditional use permit for a medical office building and parking garage adjacent to St. Thomas Hospital. The homeowners' association of a neighboring condominium development and other parties who opposed the project filed a petition for a writ of certiorari in the Chancery Court for Davidson County. The trial court heard the case without a jury and upheld the Board's decision to grant the conditional use permit. On this appeal, the project's opponents take issue with the procedures followed by the Board in granting the conditional use permit and also assert that the project does not comply with the Zoning Ordinances for the Metropolitan Government of Nashville and Davidson County. We affirm.

## I.

The Knights of Columbus Council 544 maintain their clubhouse on a 6.2 acre tract on Bosley Springs Road[1] immediately behind St. Thomas Hospital in Nashville. The property adjoins Richland Creek and is located in a floodplain.[2] It is also in a district zoned MO (Medical office and service district).[3] The Martin Companies, Inc. ("Martin"), a Nashville developer, obtained an option for the property intending to construct a ten story, 261,000 square foot medical office building and 400,000 square foot parking garage. However, before it could begin construction, Martin was

---

[1]Bosley Springs Road is a minor road that empties onto Harding Road near the intersection of Harding and White Bridge Roads.

[2]For the purposes of the zoning ordinance, a "floodplain" means "the relatively flat or lowland area adjoining a river, stream, watercourse, lake, or other body of standing water which may be covered temporarily by floodwater. For administrative purposes, the "floodplain" is defined as the area that would be inundated by high water at the flood profile from which flood protection evaluation is established." Metropolitan Government of Nashville and Davidson County, Tennessee, Code § 17.04.500 (1991) ("Metro. Code").

[3]MO districts are "designed to permit a grouping of linked medical functions in an area specializing in community facility activities in sections of the community where more general commercial districts with a broader range of permitted activities would be inappropriate. With limited exceptions all activities are to be conditional uses to avoid an adverse impact upon the character of the surrounding community. Community facilities and utilities necessary to serve these districts or the general community welfare are also permitted. Required bulk limitations are designed, in part, to maximize compatibility with lesser intense use of land or building in proximate residential districts." Metro. Code § 17.56.030 (1991).

obliged to obtain a conditional use permit from the Metropolitan Board of Zoning Appeals.

The Board of Zoning Appeals conducted a public hearing concerning the project on March 30, 1995. A representative of the Knights of Columbus and several representatives of Martin spoke in favor of the development and answered the Board members' questions about the project's impact on the surrounding community. Other property owners and organizations, including St. Thomas Hospital, the Dominican Campus, the Friends of Richland Creek, the Cherokee Park Neighborhood, the White Bridge Neighborhood Association, and the Kenner Avenue Neighborhood Group opposed the project because of concerns over its impact on area traffic.

At the time of the hearing, the city's Traffic and Parking Division had approved the project subject to several conditions, even though the Metropolitan Planning Commission had not given the project a favorable recommendation. The Tennessee Department of Transportation had not acted on Martin's proposed modifications to Harding Road. At the close of the proof, the chair of the Board of Zoning Appeals moved to approve the conditional use permit. Three Board members voted in favor of the project, three voted against, and one member abstained. After some discussion concerning the voting procedure,[4] the Board of Zoning Appeals voted to defer further consideration of the project until April 27, 1995, in the hope that the Tennessee Department of Transportation would have completed its Advanced Planning Report.

The Department of Transportation's Advanced Planning Report had not been released by the time the Board of Zoning Appeals reconvened on April 27, 1995. After considering the comments of two members of the Metropolitan Council who

_____

[4]The pertinent portion of the discussion is as follows:

| | |
|---|---|
| Mr. Howser: | Point of Order. Mr. Chairman, when we prepare the order, if it fails, it will be a finding of fact? |
| Mr. Spann: | Well it hasn't failed yet sir. Since it tied 3 to 3 on votes it will come up again in two weeks to see if someone wishes to change their vote. |
| Mr. Petrey: | The action will come up again in thirteen days. |
| Mr. Howser: | That's not the way I read the rules, but that's O.K. |
| Mr. Petrey: | If it's tied up on votes then, . . . |
| Mr. Shepherd: | That's right. I explained it to you the other day. It stays on the docket for two, no. It stays on the docket for thirty days to see if anyone changes their vote. After thirty days, and no one changes their vote with more than 5 people participated in the case then it becomes a denial by operation of law. |

opposed the project, the Board, by a vote of five to two, granted Martin a conditional use permit subject to several conditions intended to lessen the project's impact on the traffic in the area.[5]  With regard to the project's compliance with the Advance Planning Report, the Board member who moved to grant the conditional use permit explained that "if the advanced traffic study has something in it that their proposed plan would not conform to then, by the very nature of this motion, they don't have a conditional use permit."

The Lions Head Homeowners' Association and other opponents of the project filed suit in the Chancery Court for Davidson County seeking review of the decision of the Board of Zoning Appeals.  The trial court considered the record made before the Board and upheld the decision to grant the conditional use permit.  The opponents have appealed to this court.

## II.
### THE CONTENTS OF THE RECORD ON APPEAL

At the outset, we take up Lions Head Homeowners' Association's assertion that the trial court erred by denying its motion to strike the record of the proceedings before the Board of Zoning Appeals because it was not timely filed.  We need not tarry long with the seemingly self-defeating argument[6] because the Board filed the record as soon as practicable and because Lions Head Homeowners' Association was not prejudiced by the time taken by the Board to prepare and file the record.

_____

[5]These conditions, which reflected commitments Martin had already made, included: (1) providing an additional westbound lane on Harding Road beginning at Bosley Springs Road and ending at White Bridge Road, (2) constructing a new curb on the north side of Harding Road, (3) agreeing upon the width of the westbound and center lanes on Harding Road, and (4) providing a performance bond for the highway improvements.

[6]Lions Head Homeowners' Association and the other appellants have the burden of demonstrating that the Board exceeded its jurisdiction, acted illegally, arbitrarily, or without material evidence to support its decision.  *See Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals,* 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996); *Hemontolor v. Wilson County Bd. of Zoning Appeals,* 883 S.W.2d 613, 616 (Tenn. Ct. App. 1994); *Roberts v. Knoxville Transit Lines,* 36 Tenn. App. 595, 612, 259 S.W.2d 883, 890 (1952).  If it were to succeed in striking the record of the proceedings before the Board, it would have a difficult time overcoming the presumption that the lower tribunal's proceedings and decision were regular and valid.  *See Tennessee Cartage Co. v. Pharr,* 184 Tenn. 414, 421, 199 S.W.2d 119, 122 (1947); *Gay v. City of Somerville,* 878 S.W.2d 124, 127 (Tenn. Ct. App. 1994).

Tenn. Code Ann. § 27-9-109(a) (1980) provides that boards whose decisions are being reviewed in a certiorari proceeding file a complete record of the proceedings with the reviewing court "immediately upon the grant of a writ." While we have not had occasion to construe this particular requirement, the Tennessee Supreme Court has construed similar language[7] to require that the record be filed "as soon as practicable." *Cooper v. Alcohol Comm'n*, 745 S.W.2d 278, 281 (Tenn. 1988). The supreme court also indicated that its decision to set aside the reversal of a local administrative agency's decision because of delay in filing the record was heavily influenced by the lack of prejudice to the petitioner. *See Cooper v. Alcohol Comm'n*, 745 S.W.2d at 282.

In this case, the Board of Zoning Appeals filed the record with the trial court approximately five and one-half months after the project's opponents filed their petition for writ of certiorari. The record was 492 pages long, and included over two hundred pages of oral testimony that the Board was required to have transcribed. The record shows that the Board's staff began compiling the record shortly after the petition for writ of certiorari was filed and that the record had been filed with the trial court for approximately six months before the trial court hearing. The project's opponents have not claimed that they were prejudiced by this delay, and indeed, it is difficult for us to conceive how they could have been prejudiced because the project has not moved forward since these proceedings were commenced. Accordingly, we find that the trial court correctly denied the motion to strike the record of the proceedings before the Board of Zoning Appeals.

## III.

### APPLICATION OF METRO. CODE § 17.124.140(C) (1994)

Lions Head Homeowners' Association and the project's other opponents take issue with the Board of Zoning Appeals' decision that Martin was not required to satisfy the three requirements in Metro. Code § 17.124.140(C) and with its alternative conclusion that the project actually satisfied these requirements. Our primary inquiry concerns the applicability of Metro. Code § 17.124.140(C)'s requirements to this

---

[7]Tenn. Code Ann. § 57-5-108(e) (Supp. 1996) requires local beer boards to file a complete record of their proceedings "[i]mmediately upon the grant of the writ of certiorari."

project.  Because we have determined that these requirements do not apply to Martin's project, we need not address the latter issue.

## A.

Prior to 1992, the zoning ordinances permitted owners of property in an MO zoning classification to construct certain types of buildings and structures whose maximum floor area ratio[8] did not exceed 1.0.  *See* Metro. Code § 17.64.020(B) (1992).  Property owners desiring to construct one of these buildings were required to obtain a conditional use permit from the Board of Zoning Appeals and thus were required to satisfy the Board that the project:

> A.     Is so designed, located, and proposed to be operated that the public health, safety and welfare will be protected;
> B.     Will not adversely affect other property in the area in which it is located;
> C.     Is within the provision of "conditional uses" as set out in this title; and
> D.     Conforms to all applicable provisions of this title for the district in which it is to be located and necessary for public convenience in that location.

Metro. Code § 17.124.040 (1995).  The zoning ordinances, as they read at the time, did not permit any project whose floor area ratio exceeded 1.0.

In 1992, St. Thomas Hospital requested the Metropolitan Council to permit the construction of larger buildings on smaller lots with an MO zoning classification.[9] With the Metropolitan Planning Commission's blessing, the Metropolitan Council amended the zoning ordinances to permit projects on property with an MO zoning classification whose maximum floor area ratio did not exceed 1.5 subject to three

---

[8]For the purpose of the zoning ordinances, "Floor area ratio" means "the total floor area on a zone lot, divided by the lot area of that zone lot.  For example, a building containing twenty thousand square feet of floor area on a zone lot of ten thousand square feet has a floor area ration of 2.0."  Metro. Ord. § 17.04.520 (1991).

[9]Since this change was limited only to MO zoning classifications, it ostensibly benefitted only St. Thomas Hospital, Memorial Hospital, Tennessee Christian Medical Center, and Madison Hospital.

conditions in addition to those already contained in Metro. Code § 17.124.040. This amendment, now found in Metro. Code § 17.124.140(C)[10] states, in part, that

> In the MO district the board may authorize site development plans proposing a floor area ratio of up to and including 1.5, provided that:
>     1.    The principal access of the facility shall be to any street designated on the major street plan adopted by the metropolitan planning commission;
>     2.    The facility shall abut or be across a public right-of-way from areas policied by the general plan for either nonresidential, mixed-use, or high-density residential uses;
>     3.    The application, at the time of filing, shall contain a traffic impact study that has been approved by the staff of the traffic and parking commission. The recommendations of the staff of the traffic and parking commission shall become a condition of the approval resolution of the board.

Even though it is undisputed that the floor area of Martin's proposed project is 0.98, the Lions Head Homeowners' Association and the project's other opponents insist that Martin must satisfy the three additional requirements in Metro. Code § 17.124.140(C). Thus, we must determine whether the phrase "up to and including 1.5" in Metro. Code § 17.124.140(C) means that the requirements in this ordinance apply to all buildings and structures constructed on property with an MO zoning classification or whether it means that these requirements apply only to projects whose floor area ratio is greater than 1.0 but less than or equal to 1.5.

### B.

The courts construe zoning ordinances using the same principles used to construe statutes. *See City of Knoxville v. Brown,* 195 Tenn. 501, 507, 260 S.W.2d 264, 267 (1953); *Anderson County v. Remote Landfill Servs., Inc.,* 833 S.W.2d 903, 908-09 (Tenn. Ct. App. 1991). Thus, when the language of a zoning ordinance is clear, the courts will enforce the ordinance as written. If, however, the language is ambiguous, the courts will bring to bear the customary interpretational canons in

---

[10]This provision was originally designated as Metro. Code § 17.124.140(D). In 1994, the Metropolitan Council deleted Metro. Code § 17.124.140(C) and redesignated the remaining subsections accordingly.

order to arrive at the ordinance's meaning. *See Whittemore v. Brentwood Planning Comm'n,* 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

Accordingly, the courts construe zoning ordinances as a whole, *see Tennessee Manufactured Hous. Ass'n v. Metropolitan Gov't,* 798 S.W.2d 254, 257 (Tenn. Ct. App. 1990), and give their words their natural and ordinary meaning unless the ordinance requires otherwise. *See Boles v. City of Chattanooga,* 892 S.W.2d 416, 420 (Tenn. Ct. App. 1994). A proper construction furthers the ordinance's general purposes, *see Jagendorf v. City of Memphis,* 520 S.W.2d 333, 335 (Tenn. 1974); *State ex rel. Smith v. City of Nashville,* 51 Tenn. App. 23, 29, 364 S.W.2d 106, 109 (1962), but at the same time prevents the ordinance from being applied to circumstances beyond its scope. *See Red Acres Imp. Club, Inc. v. Burkhalter,* 193 Tenn. 79, 84-85, 241 S.W.2d 921, 923 (1951).

The courts must also construe zoning ordinances with some deference toward a property owner's right to the free use of his or her property. *See State ex rel. Morris v. City of Nashville,* 207 Tenn. 672, 680, 343 S.W.2d 847, 850 (1961); *Boles v. City of Chattanooga,* 892 S.W.2d at 420; *State ex rel. SCA Chem. Servs., Inc. v. Sanidas,* 681 S.W.2d 557, 562 (Tenn. Ct. App. 1984). Accordingly, the courts should resolve ambiguities in a zoning ordinance in favor of a property owner's unrestricted use of his or her property. *See State ex rel. Wright v. City of Oak Hill,* 204 Tenn. 353, 356, 321 S.W.2d 557, 559 (1959).

## C.

The language in Metro. Code § 17.124.140(C) empowering the Board of Zoning Appeals to authorize projects with a floor area ratio "up to and including 1.5" is amenable to two interpretations. First, it could mean that the requirements in Metro. Code § 17.124.140(C) apply to all projects on property with an MO zoning classification with a floor area ratio equal to or less than 1.5. Second, it could mean that the requirements in Metro. Code § 17.124.140(C) apply only to projects on property with an MO zoning classification with a floor area ratio greater than 1.0. The Board of Zoning Appeals and the trial court followed the latter interpretation,

and we find this interpretation to be most consistent with the language and purposes of the zoning ordinances.

Metro. Code § 17.124.140(C) should be considered in pari materia with the other zoning ordinances applicable to property with an MO zoning classification and in light of the history of the ordinance's enactment. In this context, it becomes clear that the purpose of Metro. Code § 17.124.140(C) was to impose additional requirements only on projects in MO districts whose floor area ratio exceeds 1.0, not to impose additional requirements on projects whose floor area ratio is less than 1.0. The additional requirements in Metro. Code § 17.124.140(C) relate to the anticipated increased burden on traffic that could be caused by higher density developments. Both the ordinance's caption and the Metropolitan Planning Commission's analysis state that its purpose was to permit an increase in the floor area ratio from 1.0 to 1.5 under strictly controlled conditions.[11]

Metro. Code § 17.124.140(C) applies only to projects whose floor area ratio exceeds 1.0. Since the floor area ratio of Martin's proposed project is 0.98, the Board of Zoning Appeals correctly determined that Martin was not required to demonstrate compliance with the three conditions in Metro. Code § 17.124.140(C).

## IV.
### THE BOARD'S VOTING PROCEDURE

Lions Head Homeowners' Association also insists that the voting procedure used by the Board of Zoning Appeals was inconsistent with Metro. Code § 17.16.060 and that the failure of the proposal to receive four or more votes at the March 30, 1995 meeting necessarily means that Martin's request for a conditional use permit was denied. We have concluded that the Board's voting procedure was consistent

---

[11]The Metropolitan Planning Commission's staff report pointed out that the zoning ordinance permitted a similar increase in the floor area ratio for projects on property in OP or OG classifications. Metro. Code § 17.64.020(B) (1992) permits an 0.50 maximum floor area ratio in these districts; however, Metro. Code § 17.124.380 (1992) permits a floor area ratio "up to .75" under certain conditions. While the language used in Metro. Code § 17.124.380 is clearer than that found in Metro. Code § 17.124.140(C), the language in Metro. Code § 17. 124.140(C) has the same effect.

with the zoning ordinance and that the Board's action on April 27, 1995 effectively approved Martin's request for a conditional use permit.

The zoning ordinances requires the Board of Zoning Appeals to adopt rules of procedure for the conduct of its meetings. Metro. Code § 17.16.060(A) (1992) specifically requires the Board to adopt a rule of procedure governing voting that requires

> The presence of four members shall constitute a quorum and the concurring vote of at least four members of the board shall be necessary to deny or grant any application before the board. In the event that five or more members are present, failure to receive four concurring votes within thirty days of the public hearing shall be deemed a denial. In the event there are less than five members present and failure to receive four concurring votes within thirty days of the public hearing, then the application shall again be advertised and set for public hearing at the next regular meeting at which said application shall be eligible.

In response to the ordinance's directions, the Board adopted Rule 9(C) which states:

> Where an application does not receive four (4) votes of approval or denial, the application shall be considered at all subsequent meetings held within the following thirty (30) days. At such subsequent meeting, a member may change his-her vote or a member not present at the original hearing on the case may add his-her vote if he-she has listened to the tape recording of the public hearing and reviewed the entire file.

Lions Head Homeowners' Association interprets Metro. Code § 17.16.060(A) to mean that an application for a conditional use permit must be deemed denied if it receives less than four favorable votes at any meeting held within thirty days of the public hearing. Relying on this interpretation, Lions Head Homeowners' Association asserts that Martin's application for a conditional use permit was effectively denied on March 30, 1995 when it received only three favorable votes.

The interpretation of Metro. Code § 17.16.060(A) advanced by Lions Head Homeowners' Association is at odds with the ordinance's plain and ordinary meaning and would cause internal inconsistencies in the ordinance itself. Under both Metro.

Code § 17.16.060(A) and the Board's Rule 9(C), an application is deemed passed if it receives four or more votes at any meeting held within thirty days of the public hearing. The Board approved Martin's application for a conditional use permit on April 27, 1995 by a vote of five to two. Because this vote was taken within thirty days of the public hearing, it complies with both Metro. Code § 17.16.060(A) and Rule 9(C).

V.

**THE BOARD'S REFUSAL TO REOPEN THE RECORD**

As a final matter, Lions Head Homeowners' Association and the project's other opponents take issue with the Board's refusal to reopen the record to permit them to file additional evidence. They insist that the Board's decision was arbitrary and capricious and deprived them of a fair hearing because the Board reopened the record to receive other evidence. Since the substance of the evidence offered by the project's opponents was largely immaterial to whether Martin met the requirements for obtaining a conditional use permit, we have concluded that any error on the part of the Board did not affect the outcome of the proceeding and was, at most, harmless.

**A.**

Much of the discussion at the March 30, 1995 hearing concerned the effect of the project on area traffic and whether Martin's proposed improvements to Harding Road would be consistent with an Advance Planning Report being prepared by the Tennessee Department of Transportation. When it became clear that the project would not be approved by four or more board members, the Board decided to defer further consideration of the project until April 27, 1995.

In an effort to buttress their position, the project's opponents convinced the Commissioner of the Tennessee Department of Transportation to send a letter dated April 20, 1995 to the Metropolitan Department of Public Works, stating, in part, that "this Department will not approve the plan proposed by RPM & Associates for improvement to US 70 (Harding Road). The plan has substandard traffic lane widths (nine and ten foot lanes) and could be totally contrary to the recommendations of the

Advance Planning Report (APR)." Even though counsel for the opponents sent a copy of the Commissioner's letter to each board member, the Board declined to reopen the evidentiary record to include this letter. However, the Board permitted its staff to add an April 27, 1995 letter from the Department of Transportation stating that the Advance Planning Report "has not been completed by TDOT at this time."

During its consideration of this case, the trial court permitted Martin to supplement the record with a letter dated January 23, 1996, from the Commissioner of the Department of Transportation stating that the Department had approved Martin's plans for the improvement of Harding Road dated October 25, 1995. The trial court also permitted the opponents of the project to supplement the record with copies of the Commissioner's April 20, 1995 letter as well as a March 24, 1995 letter from the Executive Director of the Metropolitan Planning Commission stating that the Commission recommended that Martin's application for a conditional use permit be denied.

## B.

Governmental agencies conducting adjudicatory hearings are not required to leave the evidentiary record open indefinitely. They have the discretion to decide when the record should be closed and whether the record should be reopened for the presentation of new evidence. *See NLRB v. Staten Island Hotel Ltd. Partnership,* 101 F.3d 858, 861 (2d Cir. 1996); *Upper Moreland Township Dist. v. Pennsylvania Labor Relations Bd.,* 695 A.2d 904, 907 (Pa. Commw. Ct. 1997); *City of El Paso v. Public Util. Comm'n,* 609 S.W.2d 574, 578 (Tex. Civ. App. 1980). Decisions with regard to reopening the record should take into consideration (1) the status of the decision-making process, (2) the relevance and materiality of the evidence sought to be added, and (3) the propriety of affording the parties an opportunity to respond to the new evidence.

The Board of Zoning Appeals actually reopened the record in this case when it reconvened on April 27, 1995. It permitted two members of the Metropolitan Council to speak in opposition to the project, and it accepted a letter from the

Department of Transportation confirming what the Board already knew - that the Advance Planning Report had not yet been completed. Since the Board admitted additional evidence and had not yet decided whether to grant Martin's request for a conditional use permit, it should have also permitted the project's opponents to file with the record the April 20, 1995 letter from the Commissioner of the Department of Transportation.

The Board's refusal to include the April 20, 1995 letter in the record does not necessarily mean that the project's opponents did not receive a fair hearing or that the Board acted arbitrarily and capriciously when it granted the conditional use permit. The Board members were aware of the substance of the April 20, 1995 letter because the attorney representing the project's opponents had mailed a copy to them prior to the hearing. The relevance of the letter was, at most, marginal since prior state approval of a project's proposed road improvements is not required for obtaining a conditional use permit. All parties present at the April 27, 1995 hearing understood that the project could not proceed, even if the Board granted the conditional use permit, without eventual approval by the Tennessee Department of Transportation.[12]

In summary, the Board of Zoning Appeals should have included the April 20, 1995 letter in its formal record. However, the Board's failure to do so does not require us to overturn its decision to grant the conditional use permit. The decision with regard to opening the record to include the April 20, 1995 letter did not affect the outcome of the proceeding, and thus the project's opponents suffered no prejudice by the Board's action.

**VI.**

---

[12]The relevance and materiality of the April 20, 1995 letter is now even further undermined by the Commissioner's January 23, 1996 letter approving the plans for improving Harding Road.

We affirm the trial court's judgment upholding the decision of the Metropolitan Board of Zoning Appeals to grant The Martin Companies' application for a conditional use permit. We also remand the case to the trial court for whatever other proceedings may be required, and we tax the costs of this appeal, jointly and severally, to Lions Head Homeowners' Association, White Bridge Neighborhood Association, Inc., Friends of Richland Creek, Inc., Mike Lamb, and The Dominican Campus, and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:

_____
SAMUEL L. LEWIS, JUDGE

_____
DAVID H. WELLES, SPECIAL JUDGE