IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2019 Session

## VENTURE HOLDINGS, LLC v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, BY AND THROUGH METROPOLITAN BOARD OF ZONING APPEALS

**Appeal from the Chancery Court for Davidson County**
**No. 18-477-II    Anne C. Martin, Chancellor**

_____

### No. M2018-01838-COA-R3-CV

_____

This case involves an appeal to the Davidson County Chancery Court ("trial court") of an administrative zoning decision denying an application for a special exception permit. In January 2018, the petitioner, Venture Holdings, LLC ("Venture"), filed an application with the respondent, the Metropolitan Government of Nashville and Davidson County, Tennessee, acting by and through the Metropolitan Board of Zoning Appeals ("the Board"), for a special exception permit to build a waste transfer station at a particular location. Following an administrative hearing, the Board denied Venture's application upon finding that Venture had failed to meet the applicable requirements set forth by the Zoning Code for Metropolitan Nashville and Davidson County ("Metro Code"). Venture, through a petition for writ of certiorari, appealed the Board's decision to the trial court, alleging that the Board's decision was not supported by substantial or material evidence and was illegal, arbitrary, and capricious. Following a hearing, the trial court found substantial and material evidence to support the Board's decision and affirmed the Board's denial of Venture's application. Venture timely appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Joe Weyant, Clarksville, Tennessee, for the appellant, Venture Holdings, LLC.

Jon Cooper, Director of Law, and Lora Barkenbus Fox and Catherine J. Pham, Metropolitan Attorneys, Nashville, Tennessee, for the appellee, Metropolitan

Government of Nashville and Davidson County, Tennessee, by and through Metropolitan Board of Zoning Appeals.

## OPINION

### I. Factual and Procedural Background

Prior to this action, Venture entered into a land sale and purchase agreement with Richland South, LLC, to purchase a 16.44-acre parcel of unimproved real property located at 526 Myatt Drive in Madison, Tennessee ("the Property"), with the intention of operating a solid waste transfer facility. Venture, which is headquartered in Clarksville, Tennessee, then filed an application for a special exception permit with the Board on January 30, 2018, requesting permission to construct and operate a solid waste transfer facility on the Property.

Venture's application was filed pursuant to Metro Code § 17.40.280, which provides in pertinent part that "[t]he metropolitan board of zoning appeals shall hear and decide requests for special exceptions in accordance with the provisions of this Zoning Code." Metro Code § 17.40.280 also provides that "[s]pecial exceptions shall be regulated in a manner consistent with" Tennessee Code Annotated § 13-7-206, which provides in pertinent part that "[t]he zoning ordinance may provide that the board of appeals may, in appropriate cases and subject to the principles, standards, rules, conditions and safeguards set forth in the ordinance, make special exceptions to the terms of the zoning regulations in harmony with their general purpose and intent." *See* Tenn. Code Ann. § 13-7-206(a) (2011).

The Property, zoned as Industrial Restrictive ("IR"), is abutted on two sides by residential properties.[1] Additionally, the Property is abutted to the north by property developed with a large warehouse use. The trial court summarized its findings concerning the general details of the facility's operations as proposed by Venture:

> According to [Venture], the proposed waste transfer facility would accept municipal solid waste from residential and commercial customers. Per the proposal, waste would be compacted on-site, placed in larger vehicles, and hauled to a landfill. The facility would operate on a 24-hour basis, with loading and unloading of waste taking place from 7:00 A.M. – 6:00 P.M., Monday through Friday and 7:00 A.M. – 1:00 P.M. on Saturday. Trucks would leave the site in the morning beginning at 4:00 A.M. and

---

[1] Throughout the record and in its brief on appeal, the Board has alleged that the Property was abutted by residential property on three sides. However, during oral argument before this Court, the Board acknowledged that the Property is in fact only abutted by residential property on two sides.

return at various intervals throughout the day, with approximately 73 trips expected between 7:00 A.M. and 8:00 A.M. peak hours and 110 trips between 4:30 P.M. and 5:30 P.M. peak hours.

As the trial court also noted, Venture anticipated that the facility would utilize eighty-five employees and seventy trucks per day, "vary[ing] in size from 54 foot semi-trailer trucks to 20-25 foot front/rear-end garbage trucks."

The parties acknowledge that two sets of the Metro Code regulations are relevant to the pending action. Metro Code § 17.16.210 pertains to waste transfer facilities specifically while Metro Code § 17.16.150 pertains to special exception permits generally. Specifically regarding waste transfer facilities, Metro Code § 17.16.210 requires the following:

> The applicant shall submit to the board of zoning appeals a detailed description of the management procedures of the facility.
>
> A. Waste Transfer.
>
> 1. Lot Size. The minimum site area shall be ten acres.
>
> 2. Street Standard. Driveway access can be from any local street, provided that street is not bounded by any residential zoning district from the driveway access point to the street's intersection with a collector street or a street designated on the major street plan. A traffic impact study shall demonstrate that traffic generated to/from the site will only use streets where the existing level of service (LOS) is "D," and it is forecasted to remain at a LOS D or better with the proposed waste transfer traffic.
>
> 3. Setback. All buildings, structures, storage containers and areas, and vehicle loading/unloading areas shall be located a minimum of one hundred fifty feet away from any residential zoning district boundary or residential structure.
>
> 4. Landscape Buffer Yard. Along all residential zone districts and districts permitting residential use, screening in the form of landscape buffer yard

3

Standard D shall be applied. In addition, the entire facility shall be enclosed by a chain-link-type fence at least eight feet in height. The fence shall be patrolled each day to remove all windblown debris captured by the fence.

5. All loading, unloading, compacting, sorting, processing or storage shall take place within a completely enclosed building.

Regarding special exception permits generally, Metro Code § 17.16.150 provides:

A. Burden of Proof. A special exception permit shall not be considered an entitlement, and shall be granted by the board of zoning appeals only after the applicant has demonstrated to the satisfaction of the board that all of the required standards are met.

B. Ordinance Compliance. The proposed use shall comply with all applicable regulations, including any specific standards for the proposed use set forth in this title, unless circumstances qualify the special exception for a variance in accordance with Chapter 17.40, Article VIII. Any accessory use to a special exception must receive express authorization from the board of zoning appeals.

C. Integrity of Adjacent Areas. A special exception use permit shall be granted provided that the board finds that the use is so designed, located and proposed to be operated that the public health, safety and welfare will be protected. The board shall determine from its review that adequate public facilities are available to accommodate the proposed use, and that approval of the permit will not adversely affect other property in the area to the extent that it will impair the reasonable long-term use of those properties. The board may request a report from the metropolitan planning commission regarding long-range plans for land use development.

D. Design and Architectural Compatibility. The operational and physical characteristics of the special exception shall not adversely impact abutting properties, including those located across street frontages. Site design and architectural features which contribute to compatibility include, but are not limited to, landscaping, drainage, access and circulation, building style and height, bulk, scale,

4

setbacks, open areas, roof slopes, building orientation, overhangs, porches, ornamental features, exterior materials and colors.

E. Natural Features. Special exception uses in residential zone districts must comply with the nonresidential tree protection regulations and other natural site features shall be preserved to the greatest extent possible so as to minimize the intrusion of nonresidential structures and parking areas.

F. Historic Preservation. Features of historical significance shall not be adversely affected by the granting of any special exception. The metropolitan historic zoning commission shall be consulted regarding those features essential to preserve the historical integrity of a building or site of historical significance.

G. Traffic Impact. The applicant shall demonstrate how the proposed use will not adversely affect the safety and convenience of vehicular and pedestrian circulation in the area. The board of zoning appeals may require a traffic impact study for any special exception land use.

H. Repealed.

I. Hazard Protection. The proposed use shall reasonably protect persons and property from erosion, flooding, fire, noise, glare or similar hazards.

J. Special Conditions. Notwithstanding a finding by the board of zoning appeals that a special exception application satisfies the minimum development standards of this article, the board may restrict the hours of operation, establish permit expiration dates, require extraordinary setbacks and impose other reasonable conditions necessary to protect the public health, safety and welfare.

On March 15, 2018, the Board conducted a public hearing regarding Venture's application. Attorney James L. Murphy, III, and Andrew Wolthers, a senior project manager at Catalyst Design Group and the engineer responsible for designing the facility, spoke on Venture's behalf.[2] The trial court described Mr. Wolthers's remarks to the Board as follows:

---

[2] Mr. Wolthers initially listed himself as the applicant on the application to the Board. However, it is undisputed that, as Mr. Wolthers verified in a sworn affidavit filed with Venture's petition for writ of

Mr. W[o]lthers addressed the specific requirements set out in Metro Code § 17.16.210(A) for waste transfer facilities: (1) lot size, (2) street standard, (3) setback, (4) landscape buffer yard, and (5) that all waste processing take place in a completely enclosed indoor facility. He explained the measures [Venture] had taken to comply with each of these requirements. He also addressed the general code provision found at Metro Code § 17.16.150(C), Integrity of Adjacent Areas, contending that as the Property was zoned IR, a waste transfer facility was compatible to the surrounding IR zoned properties.

In opposition to the facility, the Board primarily heard from representatives of businesses that owned or managed businesses on properties near the Property and Katherine Withers, a former employee with the Metropolitan Nashville Planning Department ("Planning Department"). The Board also heard briefly from Attorney George A. Dean, who represented the interests of several residents, and from one resident personally, all of whom essentially echoed concerns expressed by the three business representatives and Ms. Withers.

Seth Malamut spoke as in-house counsel on behalf of STAG Industrial, the owner of a 2,500-square-foot building adjacent to the Property. Mr. Malamut stated that for the past thirty-five years, STAG Industrial had leased the building to Jacob Holm, a producer of "sterile nonwoven fabrics, such as the whites that are the parts of Band-Aids and surgical masks." According to Mr. Malamut, Jacob Holm representatives were very concerned about the potential for rodents and contamination due to "airborne particulates" emanating from Venture's proposed facility. Jacob Holm representatives were so concerned, Mr. Malamut surmised, because if contamination were to actually occur, it would be "highly likely" that Jacob Holm would have to cease operations, affecting roughly 120 workers. STAG Industrial representatives were in turn concerned about the effect on the value of the rental property moving forward.

Representatives of two other businesses with facilities near the Property voiced their concerns regarding odors that were likely to emanate from Venture's proposed facility. Both businesses operated non-climate-controlled facilities and consequently relied on fans to draw in air from outside to cool their buildings. In particular, Jeff Guinn, General Manager of Bedrug, Inc., asserted, as the trial court summarized in its order, that odors from Venture's proposed facility would "destroy the company's

___

certiorari, Venture was always the party in interest. We note that the trial court mistakenly spelled Mr. Wolthers's surname as "Walthers" in its memorandum and order.

working environment, make it hard to recruit new employees, and threaten the health, safety and welfare of its employees."

Ms. Withers, a former planner with the Planning Department and current planner with Barge Design Solutions, spoke on behalf of several local residents who were against the facility. As the trial court summarized, Ms. Withers's presentation pointed to a number of alleged deficiencies in Venture's proposed plan, including the facility's impact on residential areas adjacent to the property. Specifically, Ms. Withers juxtaposed the likely impact of the facility with the goals of the Madison Community Plan of the NashvilleNext Policy Plan ("NashvilleNext"), which the trial court defined as "a long-range plan for community growth adopted by the Metro Planning Commission in 2015." Ms. Withers opined in pertinent part:

> The intention of community plans within Davidson County is to site heavier industrial uses, such as a waste transfer facility, within the district impact category to ensure that their impact is less on surrounding properties.
>
> So this is in what's called district industrial policy. It's reserved for non-hazardous manufacturing, distribution, and mixed business parks that are compatible with non-industrial uses.
>
> Properties at the edge of industrial areas are supposed to service [serve as] transitions. So they need to have appropriate uses and structures so that they are not impactful to adjacent less intense policy areas.
>
> The impacts of this facility are not such that they can just be screened by a wall or a fence or trees as odors, sounds, and light will travel beyond walls and fences.
>
> The transfer of waste may happen within an enclosed structure; however, trucks that are used to haul that waste will be parked on . . . the side abutting the residential area, possibly as many as a hundred trucks.
>
> The proposed property is not an appropriate location for a waste transfer facility, due not only to its location within the district industrial policy and not the district impact policy area that's required, but also being located at the edge of a policy area abutting a residential area, or even adjacent to other businesses that have large numbers of employees working on-site who will be impacted.

The Board had also received a memorandum from the Planning Department prior to the public hearing, disapproving of Venture's permit request. Analyzing the land use policy for the area, District Industrial, the Planning Department had concluded:

> D IN [District Industrial] policy areas are dominated by one or more activities that are industrial in character, and are strategically located and thoughtfully designed to serve the overall community or region, but not at the expense of the immediate neighbors. Special consideration is given to the D-IN area's surrounding transect and policy areas. In this case the surrounding properties to the south and west consist of single-family residences in T4 Neighborhood Maintenance and T4 Neighborhood Evolving policy areas. The lower-intensity residential only policy areas need a wider separation from the proposed uses. This use is inconsistent with the goals of the policy.

The essence of the Planning Department's recommended disapproval stemmed from its concern for greater separation between the proposed facility and the single-family residences to the south and west of the facility.

On March 20, 2018, the Board issued an order denying Venture's application based upon its finding that Venture had "failed to demonstrate compliance with all of the requirements applicable to this request, including the general provisions under [Metro Code] § 17.16.150." Specifically, the Board made the following findings:

a. In particular, [Metro Code] § 17.16.150(C) requires that the board finds that the use is so designed, located and proposed to be operated that the public health, safety, and welfare will be protected. It also requires the approval "will not adversely affect other property in the area to the extent that it will impair the reasonable long-term use of those properties."

b. There has also been significant testimony concerning the potential impact of the proposed waste transfer station on the surrounding residential and light manufacturing activities. In particular, there are a large number of residences and in addition, at least one of the manufacturing uses involves the use of clean rooms for the preparation of antiseptic pads and masks and are highly susceptible to particulate matter.

8

c. The impact of this facility, including odors and noise that will travel beyond walls or fences, and truck traffic, renders this particular location inappropriate for this particular use.

On April 30, 2018, Venture filed a verified petition for writ of certiorari in the trial court, requesting that the court grant its application for a writ to "set aside the arbitrary, illegal, and capricious act of [the Board] . . . ." In the petition, Venture alleged, *inter alia*, that its application "met or exceeded the entire standards" required by the Metro Code and that "[a]bsolutely no substantial or material evidence was brought before or considered by the [Board] on the stated ground(s) for denial of [Venture's] Application." Venture asserted that the Board denied its application "without a scintilla of evidentiary support."

In a "Reply Brief," filed as a pleading with the trial court prior to the final hearing, Venture contended that the Board had relied on an improper characterization of the metropolitan land use policy. Venture posited that the Metro Code had already expressly incorporated a land use policy in Metro Code § 17.04.010(B), which provides in pertinent part:

> This title is designed to implement the goals and objectives of Concept 2010: A General Plan for Nashville and Davidson County and its associated subarea and functional plans. Created by this title are a diverse range of zoning districts which establish appropriate land uses and associated standards of development needed to implement the land use policies of the General Plan.

Venture insisted that placing its facility on the Property would not be "inconsistent with the goals of the applicable land use policy" in part because the Metro Code should be the exclusive means of evaluating special exception permits. In support of this argument, Venture relied on Metro Code § 17.04.020(C), which provides: "Upon the effective date of this Zoning Code or any subsequent amendment, any new building or other structure or any tract of land shall be used, constructed or developed only in accordance with all applicable provisions of this Zoning Code."

Following the hearing, the trial court affirmed the Board's decision in an order entered October 2, 2018. The court concluded that "[p]rotecting surrounding properties from adverse, long-term impact due to non-compatible use of the Property . . . is permitted by the Metro Code § 17.16.150(C) and is a legitimate reason for denying a request to introduce a new waste transfer station to the area." The court further found substantial and material evidence in the administrative record "show[ing] that the presence of a waste transfer facility at the Property would adversely affect other property

9

in the area to the extent that it will impair the reasonable long-term use of those properties." Specifically, in finding that the Board's decision was not arbitrary, the court gave "great deference" to the Board's determination "that placing a waste transfer facility in close proximity to a manufacturer of sterile medical/surgical fabrics will negatively affect the existing business." Additionally, the court found "[e]qually persuasive" Ms. Withers's testimony regarding the "reasoning underlying Metro Code § 17.16.150(C) and the applicable zoning policies." Venture timely appealed.

## II. Issue Presented

Venture presents one issue on appeal, which we have restated as follows:

Whether the trial court erred by finding that the Board's denial of Venture's application for a special exception permit was supported by substantial and material evidence and thereby was not illegal, arbitrary, or capricious.

## III. Standard of Review

Venture is appealing the trial court's affirmance of the Board's decision to deny Venture's application for a special exception use permit. The trial court properly reviewed the Board's decision according to the standard for common law writ of certiorari. As this Court has explained:

> The vehicle for reviewing decisions of local boards of zoning appeals is through the common law writ of certiorari. *Hoover, Inc. v. Metro Bd. of Zoning Appeals of Davidson Cnty.*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997) (citing *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990)). Under the common law writ of certiorari, the reviewing court must examine whether the municipal agency acted illegally, arbitrarily, fraudulently, or in excess of its jurisdiction. *McCallen*, 786 S.W.2d at 638. In doing so, the court determines "whether there is any material evidence that supports the action of the administrative agency." *Laidlaw Envtl. Servs. of Nashville, Inc. v. Metro. Bd. of Health for Nashville & Davidson Cnty.*, 934 S.W.2d 40, 49 (Tenn. Ct. App. 1996) (citing *Lansden v. Tucker*, 204 Tenn. 388, 321 S.W.2d 795 (1959)). Courts must not "reweigh the evidence" or "scrutinize the intrinsic correctness of the decision," but independently review the record to "determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (quoting *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992)). A challenge to the evidentiary foundation for a

local zoning decision presents a question of law, which we review *de novo* with no presumption of correctness. *Id.*, 46 S.W.3d at 759. This Court's review of the evidence on appeal is no broader or more comprehensive than the trial court's review. *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980).

*Gulley v. Robertson Cty. Planning & Zoning Comm'n*, No. M2015-00734-COA-R3-CV, 2016 WL 2898478, at *2 (Tenn. Ct. App. May 12, 2016), *perm. app. denied* (Tenn. Sept. 23, 2016).

## IV. Denial of Special Exception Permit

Venture contends that it met the required standards and that the Board's decision to deny the application should be set aside for two overall reasons. First, Venture argues that the Board held Venture to a higher standard than the standard contemplated by the Metro Code because the Board placed undue weight on the NashvilleNext planning policy in its consideration of comments made by Ms. Withers and the memorandum from the Planning Department. Second, Venture argues that because the evidence presented to the Board during the administrative hearing was purportedly nothing more than "mere speculation, presumptions, and conjecture," it did not amount to substantial and material evidence, rendering the Board's decision in reliance on such to be illegal, arbitrary, and capricious. The Board contends that its decision was not illegal, arbitrary, or capricious because Venture's application failed to meet the requirements enumerated in the Metro Code and because the record is purportedly replete with material evidence. Upon careful review of the record and applicable authorities, we conclude that the trial court did not err in affirming the Board's denial of the special exception permit.

Venture asserts that the Board, and the trial court in affirming the Board's decision, considered planning principles in NashvilleNext that were outside the Metro Code. Venture insists that the trial court "misguidedly placed great emphasis on the idealistic statements of Ms. Withers and the Planning Commission in its decision to affirm the [Board's] denial of [Venture's] Application." It is Venture's contention that Ms. Withers and the Metro Planning Commission convinced the Board and the trial court to adopt NashvilleNext "as authoritative zoning law." Venture specifically takes issue with Ms. Withers's representation to the Board that "properties at the edge of industrial areas are supposed to service [serve as] transitions" and need to "have appropriate uses and structures so that they are not impactful to adjacent less intense policy areas." According to Venture, reliance on a plan such as NashvilleNext is outside the applicable zoning code.

11

Venture relies on two Metro Code provisions in support of its contention: Metro Code § 17.04.010, which Venture posits expressly adopts a planning policy other than NashvilleNext, referred to in the ordinance as "Concept 2010: A General Plan for Nashville and Davidson County," and Metro Code § 17.04.020(C), which sets forth the proposition that only the Metro Code should guide the Board's decisions. Metro Code § 17.04.020(C) provides in relevant part that "any new building or other structure or any tract of land shall be used, constructed or developed only in accordance with all applicable provisions of this Zoning Code." Venture thereby insists that because the policy aims of NashvilleNext are not contemplated by the Metro Code and because the only policies that may be considered are those found in the Metro Code, the Board's consideration of NashvilleNext rendered its decision illegal, arbitrary, and capricious. For its part, the Board has not responded on appeal to Venture's assertion that the principles of NashvilleNext, adopted by the Metro Planning Commission in 2015, are not expressly contemplated by the Metro Code.[3]

With respect to interpreting ordinances, this Court has explained:

> When the language of an ordinance is clear, the courts will enforce the ordinance as written. When, however, the language of an ordinance is ambiguous, the courts will resort to the customary principles of statutory construction. *See Whittemore v. Brentwood Planning Comm'n,* 835 S.W.2d [11,] 15 [(Tenn. Ct. App. 1992)]. Accordingly, the reviewing courts will construe a zoning ordinance as a whole and will give its words their natural and ordinary meaning. *See Lions Head Homeowners' Ass'n v. Metropolitan Bd. of Zoning Appeals,* 968 S.W.2d 296, 301 (Tenn. Ct. App. 1997); *Boles v. City of Chattanooga, 892* S.W.2d 416, 420 (Tenn. Ct. App. 1994). They will also seek the interpretation that is most consistent with the ordinance's general purposes, but they will resolve ambiguities in favor of the property owner's right to the unrestricted use of his or her property. *See State ex rel. Morris v. City of Nashville,* 207 Tenn. 672, 680, 343 S.W.2d 847, 850 (1961); *State ex rel. Wright v City of Oak Hill,* 204 Tenn. 353, 356, 321 S.W.2d 557, 559 (1959).

*421 Corp. v. Metro. Gov't of Nashville & Davidson Cty.,* 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000).

Upon review, we determine that to the extent the Board and the trial court may have considered policy principles outside of those contemplated by the Metro Code, such considerations were improper. *See* Metro Code § 17.04.020(C); *Cost Enters, LLC v. City*

---

[3] The NashvilleNext plan is not itself in the record on appeal.

12

*of Lebanon*, No. M2008-00610-COA-R3-CV, 2009 WL 856643, at *7 (Tenn. Ct. App. Mar. 31, 2009) (holding that a city council's application of "some other undefined, undisclosed and unanticipated standard would make the council's decision . . . illegal, arbitrary and, perhaps, fraudulent."). However, for reasons explained below, we determine that the Board considered the Metro Code and had substantial and material evidence before it such that its denial of Venture's application was not illegal, arbitrary, or capricious. We therefore determine any reliance on NashvilleNext principles that were not contemplated by the Metro Code to have constituted harmless error. *See generally Housewright v. McCormack*, No. E2016-00272-COA-R3-CV, 2016 WL 6958725, at *4 (Tenn. Ct. App. Nov. 29, 2016) ("Our harmless error rule considers whether the error 'more probably than not affected the judgment' or 'the substantial rights of the party.'" (quoting Tenn. R. App. P. 36(b))); *see also Boggs v. Rhea*, 459 S.W.3d 539, 547 (Tenn. Ct. App. 2014).

This Court has explained material evidence as "relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Cobble v. Greene Cty.*, 559 S.W.3d 118, 125-26 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. May 16, 2018) (quoting *Leonard Plating Co. v. Metro Gov't of Nashville & Davidson Cty.*, 213 S.W.3d 898, 903-04 (Tenn. Ct. App. 2006)). This Court has further noted that "mere beliefs, opinions and fears of neighborhood residents do not constitute material evidence." *Demonbreun v. Metro. Bd. of Zoning Appeals*, 206 S.W.3d 42, 46 (Tenn. Ct. App. 2005) (quoting *Mullins v. City of Knoxville*, 665 S.W.2d 393, 396 (Tenn. Ct. App. 1983)).

Pursuant to Metro Code § 17.16.150(A), "Burden of Proof," "[a] special exception permit shall not be considered an entitlement, and shall be granted by the board of zoning appeals only after the applicant has demonstrated to the satisfaction of the board that all of the required standards are met." Furthermore, a special exception application "shall contain sufficient information to demonstrate full compliance with all applicable standards of Chapter 17.16, Article III (Special Exception Uses)." Metro Code § 17.40.290. The applicable standards for waste transfer facilities are found in Metro Code § 17.16.150 (A)-(J) and § 17.16.210.

Primarily at issue on appeal are the requirements of Metro Code § 17.16.150, particularly subsection -150(C), "Integrity of Adjacent Areas." Although the parties dispute to some extent whether Venture fulfilled its specific obligations under Metro Code § 17.16.210, we will not focus on those specific concerns in this analysis because neither the trial court nor the Board based its decision on those alleged deficiencies. As noted by the trial court, the Board in its order did mention "truck traffic" as one of several

13

impacts that the proposed waste transfer station would have on adjacent areas. On appeal, Venture emphasizes that it complied with the requirement set forth in Metro Code § 17.16.210(A)(2) that through a traffic impact study, the applicant "shall demonstrate that traffic generated to/from the site will only use streets where the existing level of service (LOS) is 'D,' and it is forecasted to remain at a LOS D or better with the proposed waste transfer traffic." The traffic impact study, performed by KCI Technologies, Inc., concluded that "the impacts of the proposed project on the existing street network [would] be manageable," provided that certain recommendations were followed, and that the LOS would be within the "D" range or better.

In response, the Board asserts that the traffic impact study provided by Venture failed to "clearly account" for over 100 employees recently introduced to the area by Bedrug, Inc., which was a new business. This concern aside, we note that the traffic impact study included the information, provided by Venture, that truck traffic would consist of approximately seventy trucks per operating day traveling to and from the proposed facility. We therefore find that the Board's, and in turn the trial court's, observation of "truck traffic" as one effect on the adjacent area did not constitute a failure to consider Venture's compliance with the traffic-study requirement but was instead a reasonable factor in the Board's consideration of the proposed facility's potential impact on the integrity of adjacent areas.

As noted previously, Metro Code § 17.16.150(C), "Integrity of Adjacent Areas," provides:

> A special exception use permit shall be granted provided that the board finds that the use is so designed, located and proposed to be operated that the public health, safety and welfare will be protected. The board shall determine from its review that adequate public facilities are available to accommodate the proposed use, and that approval of the permit will not adversely affect other property in the area to the extent that it will impair the reasonable long-term use of those properties. The board may request a report from the metropolitan planning commission regarding long-range plans for land use development.

In compliance with Metro Code § 17.40.290, Venture submitted a memorandum to the Board with a written response to each subpart of the applicable Metro Code provisions, expressing Venture's intent "to demonstrate that [Venture] will comply with all conditions related to the development of a Waste Transfer Station facility at [the Property]." With respect to Metro Code § 17.16.150(C), "Integrity of Adjacent Areas," Venture responded:

14

The site is located in a currently zoned industrial property, and the use is compatible with surrounding IR zoned properties. Furthermore, the site is identified as D-Industrial [District Industrial] in the newly adopted Madison Community Plan of the Nashville Next Policy Plan.

Due to the unique shape of the property, the actual waste transfer building will be located more than 1,700 feet from the [Property] frontage, and approximately 350' from the nearest Industrial structure. The use is compatible with other surrounding industrial facilities which include the nearby Waste Management recycling center and the Metro Wastewater Treatment Plant. A regional zoning and land use exhibit is included as Exhibit B.

[Venture] will comply fully with the Specific Conditions (addressed later in this summary) as they relate to operations of a Waste Transfer Station, and the project will comply with all State and Local regulations governing site building, grading, drainage, and utility use.

(Emphasis omitted.)

During the Board hearing, Venture's representatives devoted a significant portion of their time to articulating Venture's compliance with the specific provisions of Metro Code § 17.16.210. Only when expressly asked about what Venture planned to do to keep the value of adjacent properties from being affected did Venture's representatives address that concern. Even then, however, Venture's representatives implied that Venture's compliance with the waste transfer facility specific provisions was sufficient to satisfy the Board's concerns. For instance, in response to questioning regarding the potential effect of Venture's facility on Jacob Holm, the "sterile manufacturer," including the possibility of particulate matter "blow[ing] over" to the property owned by STAG Industrial, Venture's representative replied: "Well . . . one of the things I would say is with the buffering that is required along two sides of it, it's going to be pretty difficult to blow to the south and the east – and the west, because you're going to have a debuffer on those boundaries."[4]

Furthermore, before this Court, Venture's counsel agreed during oral argument that it was Venture's burden to present evidence that demonstrated compliance with the relevant code provisions and that at the hearing only the opposition made reference to Metro Code § 17.16.150(C). Venture essentially posits that by following the

[4] The transcript of the Board hearing mistakenly attributes this quote to a "Mr. Collins." Upon reviewing a video recording of the hearing through a link made available in the administrative record, we note that Mr. Murphy, one of Venture's representatives, was the individual speaking.

15

requirements dictated in Metro Code § 17.16.210, it was also in compliance with Metro Code § 17.16.150(C). We disagree, noting that if we were to adopt Venture's position in this regard, Metro Code § 17.16.150(C) would be rendered superfluous as a substantive section of the code. *See 421 Corp.*, 36 S.W.3d at 475 ("[T]he reviewing courts will construe a zoning ordinance as a whole . . . ."); *cf. Rogers Gp., Inc. v. Cty. of Franklin*, No. 01A01-9110-CH-00378, 1992 WL 85805, at *5 (Tenn. Ct. App. Apr. 29, 1992) (determining that a planning commission improperly relied on a preamble to the applicable section of the county's zoning resolution because a "preamble is not a part of the resolution's controlling provisions").

As the parties recognize, this Court has addressed the Metro Code requirements for a special exception permit as relevant to a waste transfer station in two fairly recent decisions: *Waste Connections of Tenn., Inc. v. Metro. Gov't of Nashville & Davidson Cty.,* No. M2012-02290-COA-R3-CV, 2013 WL 1282011 (Tenn. Ct. App. Mar. 27, 2013), and *Binkley v. Metro. Gov't of Nashville & Davidson Cty.*, No. M2010-02477-COA-R3-CV, 2011 WL 2174913 (Tenn. Ct. App. June 1, 2011), *perm. app. denied* (Tenn. Oct. 24, 2011). We will address the applicability of each of these decisions in turn.

In *Waste Connections*, this Court reversed a trial court's affirmance of a denial of a special exception permit application for a waste transfer facility by the Council of the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro Council"). *Waste Connections*, 2013 WL 1282011, at *1. This Court held that the Metro Council's decision had been arbitrary because the "record [was] devoid of any substantial or material evidence to support the decision to disapprove the location for a waste transfer station." *Id.*

We note that the version of Metro Code § 17.40.280 in effect at the time that *Waste Connections* and *Binkley* were decided provided that the Metro Council approved or disapproved by resolution the location of waste transfer stations before the applications were sent to the Board. *See id.* at *3 (citing *Binkley*, 2011 WL 2174913, at *3). However, the version of Metro Code § 17.40.280 in effect when the instant application was heard by the Board provided that the Board "shall hear and decide requests for special exceptions in accordance with the provisions of this Zoning Code" without providing for initial review by the Metro Council.[5]

The transcript of the Metro Council meeting in *Waste Connections* "demonstrate[d] that there was no discussion of any substantive issue or criteria, only

---

[5] The Board has noted in its principal brief on appeal that the Metro Council's role in the process has since been reinstated.

very brief comments." *Waste Connections*, 2013 WL 1282011, at *5. Furthermore, the record in that matter revealed that not a single factor set forth in Metro Code § 17.16.150(A)-(J) or § 17.16.210 was either "presented to [or] discussed by the Council prior to disapproving Waste Connection[s'] location." *Id.* at *5. Indeed, Waste Connections' "application for a special exception was not even introduced." *Id.* at *6. Therefore, this Court determined that Metro Council had improperly based its decision solely on the opposition of district residents. *Id.* at *8.

In *Binkley*, this Court upheld a trial court's affirmance of the Metro Council's denial of a special exception permit. *Binkley*, 2011 WL 2174913, at *5. Mr. Binkley, the applicant, sought a special exception permit for a waste transfer facility on property that was zoned IR (Industrial Restrictive). *Id.* at *1. Mr. Binkley alleged, *inter alia*, that the Metro Council's denial of his application was arbitrary and illegal. *Id*. at *3. Essentially, Mr. Binkley argued that the Metro Council was precluded from applying any Metro Code provision other than what was then Metro Code § 17.16.210(C), the provision that, like § 17.16.210(A) governing the instant action, dealt exclusively with waste transfer facilities.[6] *Id*. at *3. Mr. Binkley further alleged that the Metro Council "used an undefined standard not found in the zoning ordinance to disapprove the [application]." *Id*. at *5. Ultimately, this Court concluded that pursuant to Metro Code § 17.40.280, the Metro Council may "consider any criteria within Chapter 17.16, Article III of the Metro Code that may apply to the location of a waste transfer facility," including the general provisions found in Metro Code § 17.16.150(A)-(J). *Id.* at *4.

During the Metro Council hearing in *Binkley*, a councilmember who opposed the facility directed the Metro Council's attention to the proposed facility's proximity to the Stones River Greenway, which he described as "the most extensive greenway Metro Nashville has invested in." *Id.* This councilmember stated that such a facility would "be in direct opposition to the Davidson County Region Solid Waste Plan," which precluded the Metro Council from considering another waste transfer facility in Davidson County until 2018. *Id.* On appeal, this Court held, *inter alia*, that "concern about the proposed facility's effect on the greenway and a desire to protect or enhance the government's substantial investment . . . falls squarely within the council's authority under Metro Code § 17.16.150(C). *Id.* Additionally, this Court held that "[c]onsideration of adherence to the solid waste plan is permitted by Metro Code § 17.16.150(B) . . . [and] the council could have considered the location of a superfluous waste transfer facility anywhere in the county as detrimental to the public welfare under Metro Code § 17.16.150(C)." *Id.*

---

[6] Under the version of the Metro Code in effect at the time that *Waste Connections* was decided, the specific criteria for waste transfer facilities were set forth in subsection (C) of Metro Code § 17.16.210, whereas the same criteria are set forth in subsection (A) of § 17.16.210 in the version applicable here. *See Waste Connections*, 2013 WL 1282011, at *5.

Venture contends that the trial court's order in this case acts as a reversal of this Court's decisions in *Waste Connections* and *Binkley*. We disagree. Venture summarizes the crux of this Court's decision in *Waste Connections* as concluding that a zoning board cannot base its "decision solely upon the concerns of residents." *Waste Connections*, 2013 WL 1282011, at *8. Upon examining the decision in *Waste Connections*, we find this summary to be incomplete. Although Venture correctly asserts that concerns of residents would not be enough to warrant a finding of substantial and material evidence, the central concern in *Waste Connections* was the deficient evidence presented to the Metro Council. *Id.* at 6.

In the instant action, not only did both parties reference the requisite code provisions throughout the hearing, but the Board sought out the provisions on its own. At the commencement of its deliberation, the Board chairperson specifically inquired of the Board's counsel: "What are the standards that we're supposed to use in determining this special exception?" The Board chairperson also asked the Board's counsel to read Metro Code § 17.16.150(C), "Integrity of Adjacent Areas," aloud. The record before us indicates that the Board contemplated its duties under the Metro Code, unlike the Metro Council in *Waste Connections*. *See Waste Connections*, 2013 WL 1282011, at *8.

Furthermore, we determine that the trial court in this action correctly followed the principles espoused in *Binkley* when it concluded that "[p]rotecting surrounding properties from adverse, long-term impact due to non-compatible use of the Property . . . is permitted by Metro Code § 17.16.150(C) and is a legitimate reason for denying a request to introduce a new waste transfer station to the area." *See Binkley*, 2011 WL 2174913, at *4 (determining that the language of Metro Code § 17.40.280 "permits the council to consider any criteria within Chapter 17.16, Article III of the Metro Code that may apply to the location of a waste transfer facility."). Venture insists that *Binkley* is distinguishable because factors were present that are not present in this case. Conversely, the Board relies on *Binkley* to support its claim that "concern for the integrity of adjacent areas is a legitimate reason for denying a request to introduce a new waste transfer station to the area."

This Court has previously referenced beer permit cases when dealing with zoning special exception permit cases. *See Waste Connections*, 2013 WL 1282011, at *7 (citing with approval *Sexton v. Anderson Cty. by & through Bd. of Zoning Appeals*, 587 S.W.2d 663, 666 (Tenn. Ct. App. 1979) (in turn citing *Harvey v. Rhea Cty. Beer Bd.*, 563 S.W.2d 790 (Tenn. 1978); *Ewin v. Richardson*, 399 S.W.2d 318 (Tenn. 1966))). Similar to waste transfer station applicants, beer permit applicants must meet a number of conditions. *See Harvey*, 563 S.W.2d at 791 ("Several conditions and provisions are required by T.C.A., s 57-205, to be met in order for an appellant to be entitled to a beer permit."). The *Harvey* Court noted that one such provision prohibited the sale of alcoholic beverages where it

18

would "otherwise interfere with public health, safety and morals." *Id.* In *Harvey*, several community members lodged generic complaints based on the morality of liquor stores generally and the potential effects on the community. *Id.* However, no "particularized harm to the public health, safety or morals [had been] demonstrated." *Id.* at 792. Noting that the prevailing statute "mandated that an applicant for a beer permit, who complies with all the legal requirements, shall be entitled to have such license or permit issued," our Supreme Court remanded the case to the board, directing it to issue the permit. *Id.*

Unlike the general grievances evinced in *Harvey*, but similar to the specific grievance expressed in *Binkley*, here the Board was presented with testimony that articulated particularized harms. The Board heard from three business representatives, all of whom expressed concern regarding the impact of Venture's proposed facility on their businesses. In-house counsel for STAG Industrial, the commercial landlord to a sterile fabrics manufacturer, verbalized concerns that particulate matter would emanate from Venture's facility and trucks, contaminate its products, and force the manufacturer to close its thirty-five-year operation, potentially leaving 120 people without employment. Representatives of two other businesses expressed concern that, due to their businesses' lack of central air, their respective work forces would constantly be subjected to unpleasant odors from Venture's facility.

Upon thorough review, we determine that as with the Metro Council's specific concern with the greenway in *Binkley*, the Board's specific concern in this action with protecting the public health, safety, and welfare of adjacent areas, particularly that of the sterile manufacturer and other businesses, is permitted by Metro Code § 17.16.150(C). *See Binkley*, 2011 WL 2174913, at *4. We therefore conclude that the trial court did not err in finding that the Board's denial of Venture's application was supported by substantial and material evidence.

## V. Conclusion

For the reasons stated above, we uphold the trial court's affirmance of the Board's order denying Venture's application for a waste transfer facility. The costs on appeal are assessed against the appellant, Venture Holdings, LLC. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

19